CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

APR 2 0 2006

JOHN F CORCORAN, CLERK
BY:
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

DENISE VAN METER,

        Plaintiff

v.

JO ANNE B. BARNHART,
Commissioner of Social Security

        Defendant

Civil Action No. 5:05cv00067

**REPORT AND**
**RECOMMENDATION**

By:   Hon. James G. Welsh
       United States Magistrate Judge

Plaintiff, Denise Van Meter, brings this action pursuant to 42 U.S.C. § 405(g) challenging a final decision of the Commissioner of the Social Security Administration ("the agency") denying her claim for a period of disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI respectively of the Social Security Act, as amended, ("the Act"), 42 U.S.C. §§ 416, 423 and 1381 *et seq*. Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

By order of referral entered November 17, 2005, this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). On January 25, 2006, the Commissioner filed her Answer and a certified copy of the Administrative Record ("R."), which included the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision.

In her subsequently filed motion for summary judgment, the plaintiff argues that the Commissioner's decision is not supported by substantial evidence for two reasons. It is her contention that the adverse decision of the administrative law judge ("ALJ") was based on his misunderstanding of her answers to certain information given the agency in a daily living questionnaire (R.87-91) and on the ALJ's improper discount of certain functional limitations acknowledged by her primary care physician (R.708). On March 29, 2006, the Commissioner filed her motion for summary judgment and supporting memorandum. Therein, the Commissioner argues that substantial evidence supports the ALJ's decision and that the credibility determinations about which the plaintiff complains are well-supported by the administrative record. No request was made for oral argument.[1] The undersigned having now reviewed the administrative record, the following report and recommended disposition is submitted.

## I.    Standard of Review

The court's review is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that plaintiff failed to meet the conditions for entitlement established by the Act and applicable administrative regulations. If such substantial evidence exists, the final decision of the Commissioner must be affirmed. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

---

[1] Paragraph 2 of the court's Standing Order No. 2005-2 directs that a plaintiff's request for oral argument in a Social Security case, must be made in writing at the time his or her brief is filed.

"Under the . . . Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard. " *Mastro v. Apfel*, 270 F3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro v. Apfel*, 270 F.3d at 176 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642). "In reviewing for substantial evidence, [the court should not] undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (quoting *Craig v. Chater*, 76 F.3d at 589). The ALJ's conclusions of law are, however, not subject to the same deferential view and are to be reviewed *de novo*. *Island Creek Coal Company v. Compton*, 211 F.3d 203, 208 (4th Cir. 2000).

## II.     Administrative History

The record shows that plaintiff protectively filed her applications for DIB and SSI on or about September 23, 2002, alleging disability as of August 1, 2002, on the basis of multiple medical complaints, including low back pain, neck pain, facial pain, chest pain, dizzy spells, "carpal tunnel," depression, anxiety attacks, and "sweats." (R.65,74). Her claims were denied, both initially and on reconsideration. (R.29-40,709-723). Pursuant to her timely request, an administrative hearing on her applications was held on August 4, 2004 before an ALJ. (R.44-48,51-57). The plaintiff was represented by counsel at the administrative hearing. (R.41-43,724-725,732-748).

3

*Inter alia*, at the hearing, plaintiff testified that her condition made it necessary for her to lay-down several times each day (R.739), and the record reflects that sometime after the hearing, her attorney submitted a treating source interrogatory answer (R.708) which plaintiff contends evidences his concurrence with this testimony.

Utilizing the agency's standard five-step inquiry,[2] plaintiff's claim was denied by written administrative decision on September 16, 2004. At the initial determinative step, the ALJ found that plaintiff met the Act's insured status requirements, at least through the date of the decision, and that she had not engaged in substantial gainful activity since August 1, 2002, the alleged disability onset date. (R.19.26). At step-two he found that the medical evidence established that plaintiff had certain medical problems which could cause significant vocationally relevant limitations and were, therefore, "severe" impairments[3] within the meaning of the Act. (R.19-22,26) These impairments

---

[2] Determination of eligibility for social security benefits involves a five-step inquiry. *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). It begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, step-two of the inquiry is a determination whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third-step considers the question of whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so, the claimant is disabled; if not, step-four is a consideration of whether the claimant's impairment prevents him or her from returning to any past relevant work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the impairment prevents a return to past relevant work, the final inquiry requires consideration of whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

[3] Quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" *See also* 20 C.F.R. § 404.1520(c).

4

included cervical strain, lumbosacral strain, lumbar disc degeneration, a history of carpal tunnel syndrome and temporomandibular joint syndrome. *Id,*

At step-three, the ALJ concluded that plaintiff's impairments (either individually or in combination) neither met nor were medically equivalent to an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R.22-23,26). In particular, he concluded that the plaintiff's impairments neither met nor equaled the criteria of Listing 1.02 (major dysfunction of a joint) or Listing 1.04 (disorders of the spine), and he noted that no treating or examining physician had mentioned findings equivalent to the criteria in any listed impairment. (R.22).

After further concluding that plaintiff's allegations concerning her limitations were not fully supported in the medical record, the ALJ found that the plaintiff retained the exertional ability to perform work which required her to lift and carry ten pounds occasionally, to lift and carry five pounds frequently, to stand/walk for thirty minutes at a time, to stand/walk for a total of three to four hours during an eight-hour work day, to sit for thirty minutes at a time, to sit for a total of five hours during an eight-hour work day, to do no climbing of ladders, to avoid heights and moving machinery, and to do only occasional balancing, crouching, stooping, or pushing/pulling. (R.27).

Although work at this level of exertion would not permit plaintiff to perform any of her past relevant work, the ALJ further concluded that plaintiff could perform the requirements of a number of jobs existing in the national economy, including work as a cashier, information clerk, or production inspector. (R.25-26,27)

5

After the ALJ's issuance of his adverse decision, plaintiff made a timely request for Appeals Council review. (R.13-14). This request was subsequently denied (R.8-12), and the ALJ's unfavorable decision now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.


## III.    Facts

Although the plaintiff's medical records in this case are extensive, they are largely historical in nature. For example, the earliest records show that she sustained a compensable lumbosacral injury in 1984 for which she has since been treated conservatively and symptomatically with physical therapy, hot packs, ultrasound, a tens unit, rest, exercise, occasional chiropractic or osteopathic manipulation, occasional anti-inflammatory injections and the use of Tylenol #3 or Darvocet (later Percocet) on an as needed basis. (R.98-132,134-138,140-142,144-151,161-179,226-228,570-571). Follow-up X-rays in 1991 and in 1999 and a CT-scan in 1991 all disclosed no abnormalities of the lumbosacral spine, no lesions, and not encroachment of the spinal canal. (R.137,229-235,236-237,375,379,425). Later MRIs in 1995, 1998 and 1999 were also normal (R.163,415,384), and an orthopaedic assessment in July of the same year demonstrated only "slight tenderness over the lumbosacrum" and "some limitation" of flexion (R.124). Her soft tissue lower back injury did not result in any radiated pain into the lower extremities (*E.g.*R.378), and in 1996 she described the residual pain as one that "comes and goes" (R.630).

6

In addition to routine primary medical care, plaintiff's medical records show an elevated level of HDL cholesterol beginning in 1991, development of carpal tunnel syndrome[4] in 1992 (*E.g.*, R.130,133-134), a subsequent left carpal tunnel release in 1993 (e.g., R206,214), surgical repair of injuries to her chin and to the inside of her mouth sustained in a motor vehicle accident in 1994 (*E.g.*, R.127-128), treatment in 1997 for abdominal pain of uncertain etiology (R.152-160), a number of diagnostic studies in 1998 following and incident of acute chest discomfort (*E.g.*, R.152,262,265,268), and treatment for neck and upper back pain following a fall in March 1999 (R.601,604-605). (*Generally see* R.127-128,130,133-134,139,143,152-160,180-202,203-205,206-225,238-340,342-359,360-369,370-374,381-415,417-427,428-465,468-491,493-512,514-518,538-630,677-700). In connection with the 1998 epigastric incident, an echocardiogram was normal (R.268); a chest X-ray was normal (R.262), and upper gastrointestinal testing disclosed only a small hiatal hernia. (R.261,265).

Beginning in 1999, the office notes of plaintiff's primary care physician, Dr. John Sharp, record various clinical signs of depression, including complaints of feeling "tense" (R.601), being under "stress" (R.590), having "nerves" (R.589), and having "palpations" and "sweats" (R.563). Dr. Sharp prescribed an antidepressant regime and subsequently attributed her depression to the neck strain and the residuals of her 1984 low back injury. (R.595,581).

---

[4] Although the medical records indicate that plaintiff complained of "bilateral" carpal tunnel difficulties, X-rays of the bony structure of the right wrist disclosed no evidence of degenerative or inflammatory changes (*e.g.* R.416).

7

On January 8, 2000, the plaintiff was seen at Rockingham Hospital for neck pain that developed after feeling "something pop in her neck." (R.459-460). An X-ray taken the same day disclosed only a "slight[ly]" abnormal cervical curvature due to muscle tightness. (R.463). A muscle relaxant and a pain reliever were prescribed. (R.461).

Fourteen months later, the plaintiff was twice seen in Rockingham Hospital emergency room. On March 16, 2001, she presented with complaints vertigo, headaches, and "electric shock" sensations. (R.451-452) A brain CT-scan was essentially normal; an antihistamine was prescribed (R.452), and a follow-up brain MRI was normal (R.436). On March 22, she presented with complaints of right arm and neck pain.[5] (R.445). A cervical X-ray disclosed only "mild" narrowing of the C3-4 disc space with attendant degenerative disc disease. (R.447); a cervical MRI similarly disclosed only a single small protruding disc without any spinal cord compression (R.429), and a subsequent dynamic motion X-ray evaluation further confirmed this finding (R.466-467).

During the Spring and Summer of 2001, the plaintiff also received routine medical care, including evaluations related to her complaints of (and later resolved) right carpal tunnel symptoms, sleep disturbance, headaches, chronic cervical and low back pain, through Harrisonburg Family Practice Associates. (R.493-512). During this period, she was on a multiple medication regime that included Topamax for headaches, Neurontin as a sleep aid, Zoloft as an antidepressant, Premarin for menopausal symptoms, and Claritin as an antihistamine. (R.504).

---

[5] A hospital note, dated April 2, 2001, describes the plaintiff's symptoms as upper extremity "numbness and tingling." (R.444).

8

A physical therapy assessment on May 23, 2001, disclosed posterior tightness of plaintiff's upper and mid-back musculature, guarded movements, and a restricted range of motion. (R.488-489). A four to six-week (two to three visits per week) therapeutic exercise and ultrasound treatment plan was developed; however, the plaintiff attended only seven treatment sessions between May 23 and June 28. (R.469-490). At the time of her last visit, she was "without pain," and she was discharged from the program on July 12. (R.468-469).

On referral for persistent neck and jaw pain attributed to a fall earlier in the year, the plaintiff was seen on September 11, 2001 by Dr. Kenneth Klamut, an oral and maxillofacial surgeon. (R.513,520). On examination, "no evidence of fracture or serious pathology" was found, and conservative treatment (soft diet, ice as needed, and physical therapy) was recommended. (R.513). Two days later, she was seen for a physical therapy assessment of her myofascial pain, jaw dysfunction, and cervical/mid-back pain. (R.525). After a single follow-up visit and preparation of a home exercise program, the plaintiff failed to pursue further therapy. (R.523).

During the period between August 2001 and the April 2004 administrative hearing, the plaintiff continued to be treated by her family doctor, and his records document her repeated complaints of acute neck, upper back, lower back, and leg pain along with attendant feelings of stress and difficulties sleeping. (R.513-532,539-579,678-700). After complaining of significant pain, a "slipped disc" feeling, numbness and the need to take increased amounts of Percocet, she was switched to OxyContin by Dr. Sharp on December 16, 2002 and another MRI was scheduled. (R.557,672,675). After being rescheduled three times, the March 2003 MRI demonstrated only a

9

"mild" disc bulge without significant spinal canal impingement at L4-5 and a "minimal" disc protrusion at L5-S1 that "might" touch the left L5 nerve root. (R.666).

In later Rockingham Hospital ER note, dated July 4, 2003, the plaintiff is reported to have described low back problems as only "intermittent exacerbation" of the pain. (R.655). The same ER note also recorded that her medication list included Premarin, Zoloft, Tylenol, and OxyContin. (R.655).

An independent medical assessment of plaintiff's medial condition was performed by Dr. Kip Beard, an internist, on February 7, 2003. (R.533-537). On examination, he found the plaintiff to be able to stand without assistance, to walk slowly with a normal-appearing gate, to be able to sit comfortably, to be able to speak and hear without difficulty, to have good grip strength and fine manipulation ability, to have some diminished neck and back motion, to have some diminished jaw exclusion, to have normal reflexes, to have a regular heart rate and rhythm, to show no evidence of disease, swelling or atrophy in any extremity. *Id.*

As part of the administrative review process, available treating and examining source medical records were twice reviewed by state agency psychologists (R.631-644) and physicians (R.645-652). On February 21, 2003 and again on July 2, 2003, the state agency psychologists concluded that the medical records demonstrated only "mild" anxiety and suggested no severe mental health impairment. (R.631,641,643). Similarly, the state agency physicians concluded on February 21 and on July 3, 2003, that plaintiff's medical problems, including her complaints of pain, limited her

10

functional abilities to some degree. (R.645-647,650,652. In their opinion, these conditions would functionally restrict her to work at jobs that required the lifting of twenty pounds occasionally, lifting ten pounds frequently, standing/walking to about six out of an eight-hour work day, unlimited sitting, and only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R.646-649). In compliance with his regulatory obligations, their opinions and conclusions concerning plaintiff's impairments and her residual functional abilities were also considered by the ALJ as part of the decision-making process. *See* 20 C.F.R. § 404.1527(f).

Shortly before the administrative hearing, Dr. Sharp, plaintiff's primary care physician, completed a medical assessment of plaintiff's ability to do work-related activities. (R.702-706). Therein, he opined that plaintiff's lumbosacral strain and degenerative disc disease limited her ability during an eight-hour work day to lifting/carrying ten pounds occasionally, to lifting/carrying five pounds frequently, to standing/walking a total of three to four hours (twenty to thirty minutes without interruption), to sitting a total of five hours (thirty minutes without interruption), to never climbing ladders, to occasionally climbing stairs, balancing, stooping, crouching, and pushing/pulling, and to avoiding work around heights or moving machinery. *Id.* In addition, Dr. Sharp opined that the plaintiff could perform sedentary work. (R.705).

At the administrative hearing, the plaintiff testified that she was then forty-nine years of age (R.735), which classifies her as a "younger worker" under 20 C.F.R. § 1563(a). She testified that she completed the ninth grade in school and subsequently obtained a general education diploma. (R.735). *See* 20 C.F.R. §§ 404.1564, 416.964. She stated that she was injured in an accident at work

11

in January 2001; as a consequence she continues to experience neck, back, and facial pain. (R.736-737). Her back pain, she stated, radiated into her extremities, interfered with sleep, required her to use crutches from time to time, caused her to have multiple bad days each week, and made it necessary for her to spend about five hours lying-down each day. (R.738-739,741-742). She stated that her medications caused drowsiness, that she had facial pain is the result of TMJ,[6] that her husband did most of the household chores, that he had to help her get-out of the bathtub, and that she was exertionally limited to lifting/carrying ten pounds, to sitting for twenty to thirty minutes, to standing for ten minutes, and to walking a distance of only one block. (R.737-738,740-741). Additionally, she testified that she drives one hundred fifty miles, round trip, for medical appointments and that during a typical day she prepares simple meals, performs a few household chores, and watches television. (R.735-736,741-742).

Her past relevant employment included work as a housekeeper in a hospital, as a school bus driver, as a stamping machine operator, as a machine setup technician, and as a production line worker. (R.745). Although it was deemed not to be vocationally relevant by the ALJ, the administrative record also shows that she also worked at a convenience store from November 2002 until at least January 2003. (R.19,700).

---

[6] TMJ is an abbreviation for Temporo-Mandibular Joint, and is used by the plaintiff to describe pain or discomfort when she moves one or the other of the joints located in front of each ear and formed by the temporal bone of the skull and the lower jaw or mandible.

12

Robert Jackson, a vocational witness, testified that in terms of skill level, all of plaintiff's past relevant work either was unskilled or involved only position-specific skills, and that the work was all light or medium in exertional level. (R.745-746). In response to a hypothetical question involving an individual of plaintiff's age, education, vocational profile, and with the exertional limitations described by her treating physician in his July 9, 2004 medical assessment (R.702-706), Mr. Jackson testified that such an individual could do sedentary work as a cashier, as a production inspector/grader, or as an information clerk. (R.746-747). In response to several follow-up questions by plaintiff's counsel, Mr. Jackson testified that work as a cashier would require an individual to be able to make change, that work as an information clerk would require an individual to provide information orally, and that none of the identified jobs could be done by an individual who needed to lay-down five hours each day. (R.747).

In an effort to buttress plaintiff's testimony concerning her need for extended daily rest due to her medical problems, her attorney submitted a post-hearing statement from her primary care physician indicating his general concurrence with her testimony (R.708).

IV.    **Analysis**

The plaintiff's claim that the Commissioner's decision is not supported by substantial evidence must be analyzed by the court pursuant to the same five-step framework applicable to every social security disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920. *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process asks whether the plaintiff (1) is working, (2) has a severe impairment, (3) has an impairment which meets

13

or is medically equivalent to an impairment listed in Appendix I of the agency's regulations, (4) can

return to any past relevant work, and (5) if not, can perform other work. 20 C.F.R. § 404.1520. *See*

*also* 20 C.F.R. § 404.1545(a). If the final decision of the Commissioner contains a conclusive

finding at any point in this sequential process that the plaintiff either is or is not disabled, the

decisional review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a).

The plaintiff has the initial burden of showing that she is unable to return to her past relevant

work because of her functional impairments. Once she has done so, the burden shifts to the

Commissioner to establish that the plaintiff retains the functional ability, considering her age,

education, work experience and impairments, to perform alternative work that exists in significant

numbers in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)–(B); *McLain v.*

*Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir.

1980).

The ALJ in this case utilized the required five-step decisional process. He concluded that

plaintiff met the insured status requirements of the Social Security Act through the decision date

(R.19,26) and that she had not engaged in substantial work activity since the alleged disability onset

date (R.19,26). He found that the plaintiff had "severe" impairments, namely cervical strain,

lumbosacral strain, lumbar disc degeneration, a history of carpal tunnel syndrome, and TMJ

impairments which can cause vocationally relevant limitations. (R.22,26). He concluded that none

of these "severe" impairments, particularly as they related to listing 1.02 (major dysfunction of a

joint) and listing 1.04 (disorders of the spine), was at the level of severity necessary to meet or equal

14

the requirements of an impairment defined in the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1, Regulations No. 4) (R.22-23,26), and at step four he found that plaintiff's exertional limitations were sufficient to prevent her from returning to any of her past relevant work (R.25,27).

Given this step-four is finding, the general issue presented by this appeal is whether the evidence supports the Commissioner's finding that the plaintiff retained the functional ability to perform a limited range of sedentary work that exists in significant numbers in the national economy. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a). Based on his review of the entire record, including the hearing testimony of the plaintiff and of the vocational witness,[7] the ALJ's concluded that the plaintiff retained the capability to "mak[e] a successful adjustment to work that existed in significant numbers in the national economy" and that she was "not-disabled" within the meaning of the Social Security Act. (R.26-27).

## A.    *Claim of Flawed Credibility Assessment*

The first appeal issue presented in this case is whether the ALJ improperly discounted the plaintiff's statements about the extent of her functional impairments by "misconstru[ing]" and "selectively us[ing]" the responses she made in a daily activities questionnaire submitted in connection with her applications. Implicitly, plaintiff's argument is that the ALJ discredited her

---

[7] In the case now before the court, the ALJ accepted the pre-hearing functional assessment of plaintiff's primary care physician, and he incorporated it into the hypothetical question posed to the vocational witness,

Case 5:05-cv-00067-SGW-JGW    Document 13    Filed 04/20/06    Page 15 of 23    Pageid#: 64

testimony solely on the basis of selected answers she made two years previously in an agency questionnaire.

As a general proposition, the undersigned believes that a plaintiff's statements in response to a daily activities questionnaire should not be the sole basis to discredit later sworn testimony about the functional effects of that person's condition.[8] In this case, however, a careful review of the ALJ's decision discloses a significantly broader reliance on the record for his conclusion that plaintiff's statements concerning the degree to which she was exertionally impaired were not entirely credible.

Although the ALJ relied on the apparent inconsistency between plaintiff's testimony about her acute functional limitations and her December 2002 responses in the daily activities questionnaire as a reason to give plaintiff's testimony less than full credibility, his determination neither began nor ended with that single consideration. The decision notes the absence of any significant "indication" in the record to support plaintiff's complaints of mental or emotional difficulties, other than depression related to back pain "that had responded well to treatment." (R.22). Consequently, the ALJ concluded that plaintiff's allegations of depression and anxiety had only a

---

[8] Evidence of daily activities is often limited to self-care activities and will bear little relationship to work in a vocational setting or to an individual's exertional limitations at the time of the administrative hearing two (or more) years later. Additionally, it is often contradicted by substantial medical evidence. In the undersigned's experience, it is, therefore, reasonable to question an ALJ's utilization of daily self-care activities when it is used as the rationale for rejecting medical evidence, when it is used essentially as the decisional basis to discredit an individual's sworn hearing testimony, or when it is used as the basis for a work activity hypothetical. However, the level and degree to which daily activities demonstrate the presence, the intensity, the persistence of symptoms and, ultimately, an ability to function in a vocational setting, they are factors the Commissioner may properly to consider in determining a claimant's work-related capacity. See 20 C.F.R. §§ 404.1529(c)(3)(i) and 404.1572(c)(3)(i).

16

minimal effect on her functional capabilities. *Id.* Similarly, he determined that the medical record

failed to support plaintiff's claim that she was significantly impaired by chest pain, dizzy spells, and

headaches. *Id.* And in further explanation, the ALJ wrote,

> [This credibility determination was] due to inconsistencies in the record and a lack
> of support by the medical records. Although the claimant states that she is
> completely disabled by her impairments, the record indicates that she prepares some
> meals, shops for groceries, unloads the dishwasher, does the laundry, pays the bills
> and can drive 150 miles round trip to see her doctor. The record indicates that the
> claimant told Dr. Sharp that she was working in a convenience store in then fall and
> winter of 2002, which is after her alleged onset date of August 2002.

(R.24).

As stated above, the court's function in this case is limited to determining whether substantial

evidence exists in the record to support the ALJ's findings. If he considered all of the relevant

evidence and sufficiently explained his findings (including his rationale crediting evidence), the court

must not re-weigh the evidence or substitute its judgment for that of the Commissioner. *See Hays

v. Sullivan*, 907 F.2d 1453, 1456; *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th

Cir. 1997).

As outlined above, in the opinion of the undersigned magistrate judge, the contested

credibility determination was based on an appropriate consideration of the relevant evidence; the

ALJ's rationale was sufficiently explained in his decision, and it was supported by substantial

evidence. The resolution of conflicts in the evidence, as a general proposition, is a matter within the

province of the Commissioner, even if the court might resolve the conflicts differently. *Richardson

v. Perales*, 402 U.S. 389, 401 (1971); *Oppenheim v. Finch*, 495 F.2d 396 (4th Cir. 1974). Deference

17

by the court is properly owed to the ALJ's credibility determinations, especially with respect to the plaintiff's subjective allegations. *See Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

## B. *Claim of Flawed Assessment Medical Opinion*

As her second assignment of error, plaintiff contends that the ALJ failed to give the required weight to her primary care physician's statement[9] which supported her testimony of disabling exertional limitations. In effect, it is her contention that the adverse administrative decision was, as a consequence, predicated on vocational testimony given in response to an incomplete hypothetical question.

Medical information is the major proof component in any Social Security disability case, and the ALJ is obligated to give careful consideration to the opinions and diagnosis of treating physicians, as well as to the objective medical facts, opinions and diagnoses of any examining doctors. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). In determining the weight to give to a treating physician's opinion, however, the ALJ is obligated to take multiple factors into

---

[9] Implicitly, this argument by the plaintiff suggests reliance on prior Fourth Circuit precedent which obligated an ALJ to give "great weight" to the opinions of treating physicians and to disregard such opinions "only if there was persuasive contrary evidence." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). *See also Wilkins v. Secretary, HHS*, 953 F.2d 93, 96 (4th Cir. 1991); *Foster v. Heckler*, 780 F.2d 1125, 1130 (4th Cir. 1986). This "treating physician rule" was, however, superseded in 1991 by the agency's promulgation of 20 C.F.R. § 404.1527. *See Shrewsbury v. Chater*, 1995 U.S. App. LEXIS 27968, 1995 WL 592236 at *9 n.5 (4th Cir. 1995) (unpublished) ("As regulations supersede contrary precedent . . . the "treating physician rule" . . . [is no longer] controlling"). Under 20 C.F.R. § 404.1527, the opinion of a treating physician is entitled to more weight than the opinion of a non-treating physician, but it is entitled to controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Likewise, an ALJ is not bound by a treating physician's proffered opinion of disability, because final responsibility for determining the ultimate issue is reserved to the Commissioner pursuant to 20 C.F.R. § 404.1527(e)(2). *Castellano v. Secretary, HHS*, 26 F.3d 1027, 1029 (10th Cir. 1994).

18

consideration, including the scope and frequency of any examining relationship; the length, nature and extent of treatment; the objective evidence supporting the opinion; and the opinion's consistency with the medical record as a whole. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).

Additionally, the ALJ is not obligated to accept the opinions of any medical expert, including a treating source, on the nature and severity of an individual's functional impairments. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Final responsibility for deciding this issue is reserved for the Commissioner, and by regulatory direction the ALJ is obligated to "give [no] special significance to the source of an opinion" on an issue reserved for the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(2) – (e)(3), 416.927(e)(2) – (e)(3).

Thus, it is the ALJ's responsibility to weigh the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays v. Sullivan*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). While he may not reject medical evidence for no reason or for the wrong reason, under the regulations he may assign little or no weight to a medical opinion, even from the treating physician, based on the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d), if he explains his rationale sufficiently and if the record supports his findings. *See King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980).

To meet this decisional obligation and explain the basis for his assignment of little evidentiary weight to Dr. Sharp's post-hearing statement, the ALJ wrote,

In addition to the fact that the statement was obtained after the hearing, little weight is given to it because there is no mention in Dr. Sharp's treatment notes that the claimant's condition requires her to lie down during the course of the day. The statement is also vague. In the statement, the attorney indicated that the claimant testified that she was required to lie down for several hours each day. The doctor is then given the opportunity to respond "yes or no" to the statement that indicates that the claimant finds it necessary to lie down during the day. The doctor replied in the affirmative. The doctor's answer to this question is significantly different from the claimant's testimony, which indicated that she needed to lie down for 5 hours each day. The doctor's statement is vague and could be interpreted to mean that the claimant needs to lie down for an hour or two, at the end of the workday. The [ALJ] notes that the claimant made no mention to the consultive physician of a need to lie down for several hours each day. In addition, the claimant indicated in her Daily Activities Questionnaire that she did not nap during the day.

(R.24-25).

The Commissioner is charged with evaluating the medical evidence, assessing symptoms, signs and findings, and, in the end, determining the functional capacity of the claimant. 20 C.F.R. §§404.1527-404.1545; *Hays v. Sullivan*, 907 F.2d 1453 (1990); *Shively v. Heckler*, 739 F.2d 987 (4th Cir. 1984). In that connection, the Commissioner by regulations is granted some latitude in resolving inconsistencies in evidence and the court reviews the ALJ's factual determinations only for clear error. 20 C.F.R. §§ 404.1527 and 416.927. *See also Estep v. Richardson*, 459 F.2d 1015, 1017 (4th Cir. 1972). In the end, if the ALJ's resolution of the conflicts in the evidence is supported by substantial evidence then the Commissioner's final decision must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640 (4th Cir. 1966)

Without attempting to restate the evidence, the undersigned is of the opinion that the medical record in this case is devoid of any substantive evidence which supports plaintiff's claim, or the

20

inference she seeks to draw from Dr. Sharp's post-hearing statement, that the exertional demands of daily living necessitate five hours of day time rest and prevent her from doing a limited range of sedentary work activity.

She has received only conservative medical care for years. Her degenerative lumbosacral disc disease is limited to a "mild" L4-5 disc bulge without spinal cord impingement and a "minimal" disc protrusion at L5-S1. Her neck problem is limited to "mild" narrowing of the C3-4 disc space and a single "small" protruding disc without spinal cord impingement. She failed to complete her most recently recommended physical therapy regime. No physical examination has disclosed any muscle atrophy or wasting. Multiple diagnostic studies have demonstrated no neurologic problem. Within the decisionally relevant time period, no treating or examining physician has either reported or suggested work activity by the plaintiff to be medically contraindicated, and Dr. Sharp's records contain no mention or suggestion that multiple hours of daily rest is required because of plaintiff's chronic neck strain and mild degenerative disc disease.

In the opinion of the undersigned magistrate judge, the record in this case provides more than an ample touchstone for the ALJ's decision to discount Dr. Sharp's less-than-clear answer to a less-than-clear inquiry. The determination was sufficiently explained, and it is supported by substantial evidence.

## V.    Proposed Findings of Fact

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1.    The ALJ acted within his decisional authority to discount plaintiff's statements concerning the degree to which she was exertionally impaired;

2.    The ALJ acted within his decisional authority to give little weight to the post-hearing interrogatory answer of Dr. Sharp;

3.    Substantial medical and activities evidence exists to support the ALJ's finding that plaintiff's evidence regarding the severity of her symptoms and functional limitations was not entirely credible;

4.    The ALJ properly considered plaintiff's subjective complaints of exertional difficulties which necessitated her to lie-down for five hours each day;

5.    The ALJ adequately considered all of the evidence in this case, including plaintiff's testimony and treating source medical opinions;

6.    Substantial evidence exists to support the ALJ's finding that plaintiff is not disabled within the meaning of the Act;

7.    The plaintiff has not met her burden of proving disability;

8.    Substantial evidence exists to support the ALJ's finding that plaintiff retains the residual function capacity top perform a limited range of sedentary work;

9.    Substantial evidence exists to support the ALJ's finding that plaintiff is able to perform work of the type identified by the vocational expert and that such jobs are available in the national economy;

10.    The final decision of the Commissioner is supported by substantial evidence; and

11.    The final decision of the Commissioner should be affirmed.

## VI. Recommended Disposition

For the foregoing reasons, it is RECOMMENDED that an order enter AFFIRMING the final decision fo the Commissioner, GRANTING JUDGMENT to the defendant, DENYING plaintiff's motion for summary judgment, and DISMISSING this case from the docket of the court.

The clerk is directed to transmit the record in this case immediately to the presiding United States District Judge.


## VII. Notice to the Parties

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within ten (10) days hereof.  **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties.**  Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

The clerk is directed to transmit copy of this Report and Recommendation to all counsel of record.

DATED: 20th day of April 2006.

_____
United States Magistrate Judge